# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 22-568V

| | |
|---|---|
| LYNNETTE WESTBROOK,<br><br>　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: July 7, 2025 |

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.*

*Christopher Pinto, U.S. Department of Justice, Washington, DC, for Respondent.*

### DECISION AWARDING DAMAGES[1]

On May 24, 2022, Lynette Westbrook filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] ("Vaccine Act"). Petitioner alleged that she suffered Guillain-Barré syndrome ("GBS") as a result of an influenza ("flu") vaccine received on October 16, 2019. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters, and although entitlement was conceded in Petitioner's favor, the parties could not agree to damages, and their dispute was therefore submitted to resolution at a "Motions Day" proceeding on June 27, 2025.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**For the following reasons, I find that Petitioner is entitled to compensation in the form of a lump sum payment of $185,209.45 ($175,000.00 for past pain and suffering, and $10,209.45 for unreimbursed expenses).**

## I. Procedural History

The case was assigned to SPU in August 2022. ECF No. 9. In August 2023, Respondent conceded entitlement in a Rule 4(c) Report. ECF No. 17. I issued a Ruling on Entitlement on September 8, 2023. ECF No. 18.

On May 24, 2024, the parties reported that they had reached an impasse in attempting to informally resolve damages. ECF No. 31. I ordered the parties to brief their respective positions on the damages issue. ECF No. 32. Petitioner filed her brief on December 24, 2024, Respondent filed his response brief on March 20, 2025, and Petitioner filed a reply brief on April 21, 2025. ECF Nos. 41 (Pet'r Br.), 43 (Resp't Br.), 44 (Pet'r Reply Br.). The parties also requested an expedited "Motions Day" hearing and ruling. *See* ECF No. 32.

At the end of the June 27, 2025 expedited hearing, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing, which is yet to be filed on the case's docket. The transcript from the hearing is, however, fully incorporated into this Decision.

## II. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining GBS damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I – II of *Ashcraft v. Sec'y of Health & Hum. Servs.*, No. 23-1885V, 2025 WL 882752, at *1 – 4 (Fed. Cl. Spec. Mstr. Feb. 27, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

### III. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

The medical records reflect that Petitioner was 49 years old at the time that she received the flu vaccine. Ex. 1 at 1. Petitioner was unemployed but cared for her grandson with special needs. *See* Ex. 15 at 10. Petitioner had a number of pre-existing medical conditions, including vertigo, dizziness, hypothyroidism, hypertension, chronic renal insufficiency, kidney stones, atherosclerotic cardiovascular disease, stable angina, joint pain, thoracic back pain and muscle spasms, irritable bowel syndrome, costochondritis, insomnia, gastroesophageal reflux disease, and gout. Ex. 4 at 250-53, 417-22; Ex. 2 at 108-15, 118-20.

Petitioner received the flu vaccine on October 16, 2019. Ex. 1 at 1. She went to her primary care provider ("PCP"), Clinton Medical Center, on November 2, 2019, for acute upper respiratory infection symptoms, including ear pain and difficulty hearing. Ex. 2 at 104. She returned on November 7, 2019, and November 12, 2019, with the same symptoms. Ex. 2 at 101-102. She was prescribed antibiotics and then steroids. *Id.* at 102. At the November 12, 2019 visit, she also reported back pain and a headache. *Id.* at 98-99.

On November 13, 2019, Petitioner went to the Sampson Regional Medical Center Emergency Department with a complaint of lower back pain that radiated up her neck and a near fall. Ex. 5 at 159. She was diagnosed with an ear infection and lumbar strain and prescribed muscle relaxers. *Id*. On November 14, 2019 and November 16, 2019,

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

3

Petitioner visited a different emergency room, UNC Health – Smithfield, with complaints of back pain and dizziness. Ex. 4 at 10, 66. At the November 16, 2019 visit, she reported being unable to urinate. *Id.* at 10. She underwent an x-ray and MRI, which were normal. *Id.* at 14, 71. On November 18, 2019, Petitioner went to a third emergency room, UNC Health – Rex Hospital, for worsening back pain, urinary retention, constipation, and numbness from the waist down. Ex. 6 at 715. She received another x-ray, which was normal. *Id.* at 719.

On November 20, 2019, Petitioner returned to her PCP. The treating physician noted that she was now in a wheelchair, and had numbness in her arms and from the waist down. Ex. 2 at 88. Petitioner reported falling three times over the past few days. *Id.* Petitioner was diagnosed with "paraplegia, incomplete" and recommended for an urgent neurosurgery referral and prescribed gabapentin, prednisone, and hydrocodone. *Id.* at 93.

On November 21, 2019, Petitioner went to UNC Health – Rex Neurosurgery and Spine Raleigh for lower thoracic and lumbar pain, lower extremity numbness, and inability to walk. Ex. 6 at 695. The treating physician sent Petitioner to the UNC Health – Rex emergency room. *Id.* at 696. The emergency room physician admitted her to the hospital for further evaluation. *Id.* at 89, 94. Petitioner was diagnosed with GBS and underwent a spinal MRI, EMG/NCS testing, a lumbar puncture, physical therapy ("PT"), occupational therapy ("OT"), and a five-day course of IVIG therapy. *Id.* at 65-66, 75, 76, 80, 100-108, 138-148, 156, 166, 229, 262-272; Ex. 8 at 67.

Petitioner was discharged home on November 30, 2019, with a referral for home health services. Ex. 6 at 66, 70. Petitioner did not need in-patient rehabilitation. The in-home PT and OT noted that Petitioner required assistance "for all functional mobility and use of rolling walker for balance support" and was dependent on her husband and daughter to assist with activities of daily living. Ex. 3 at 17, 21. Between December 3, 2019 and January 3, 2020, Petitioner had ten PT sessions and eight OT sessions. *Id.* at 12-71.

On December 12, 2019, Petitioner received treatment from Raleigh Neurology Associates for evaluation of her numbness and weakness. Ex. 8 at 140. Petitioner was noted to be using a walker for stability. *Id.* at 145. The treating physician recommended an increase in gabapentin and suggested that she might need a further course of IVIG if her ongoing back pain, persistent weakness, and gait instability did not improve. *Id.* at 147.

On January 16, 2020, Petitioner returned to Raleigh Neurology Associates. She was found to have pain in her left arm and midback, bilateral lower extremity weakness, numbness in both feet, trouble swallowing, and was unable to walk unassisted. *Id.* at 132. The treating PA ordered a three-day course of outpatient IVIG. *Id.* at 137, 139.

On January 20, 2020, Petitioner went to her PCP for a follow-up. Ex. 2 at 70. Petitioner was "wheelchair bound due to weakness" with "reduced muscle strength" in her bilateral lower extremities. *Id.* at 72.  Petitioner was seen again at Raleigh Neurology Associates on March 6, 2020. Ex. 8 at 123. Petitioner's paresthesia and pain had improved following the IVIG, but she complained of dizziness and double-vision. *Id.* On March 27, 2020, Petitioner had another appointment at Raleigh Neurology Associates. She had some improvement, but the treating physician believed that she was suffering a "relapse of her neuropathy in the setting of possible recent viral syndrome." Ex. 8 at 119. He ordered a five-day course of IVIG and another EMG/NCS test. *Id.*

After receiving this latest course of IVIG, Petitioner had an April 28, 2020 appointment at Raleigh Neurology Associates. Ex. 8 at 106. Petitioner reported that after the IVIG, she was able to walk better, her back pain had improved, and she had numbness in her feet only at night. On examination, she displayed full strength in her upper and lower extremities. *Id.* at 110.

Petitioner had additional appointments with Raleigh Neurology Associates on August 26, 2020, October 9, 2020, and December 22, 2020. *Id.* at 68, 71, 75, 98. Petitioner complained of dizziness, gait problems, back pain, fatigue, joint pain, blurred vision, and a tremor. *Id.* at 102, 106, 110, 111. Petitioner's treater ordered a spine MRI, which revealed "multilevel degenerative disc disease and facet arthropathy, and multilevel neural foraminal narrowing at L3-L4." *Id.* at 56-57. In particular, at the October 9th appointment Petitioner was noted to have a number of spine conditions, including lumbar spine degenerative disc disease, lumbar spondylosis, and chronic pain syndrome. *Id.* at 84.

In June 2021, Petitioner's primary care provider recommended that she receive a second opinion about her ongoing neurological issues. *Id.* at 8-11. On July 6, 2021, Petitioner went to Fayetteville Neurology Associates. Ex. 7 at 3. Petitioner reported having a "flare up" of her GBS every time that she got sick that made her weak and unable to stand or walk. *Id.* at 7. The treating physician referred her to Duke University Medical Center for a third opinion. *Id.* at 4.

Petitioner was seen at Duke University Medical Center on December 3, 2021, and reported falls and a feeling like her legs were heavy. Ex. 10 at 3-5. The treater ordered a

third EMG/NCS test, which she received in March 2022. *Id.* at 9. The result was "abnormal, with evidence of a chronic left median neuropathy which localizes proximal to the wrist." *Id.* at 28-29. However, "no evidence of a more widespread polyneuropathy" was seen. In particular, there was "no evidence of an active demyelinating polyneuropathy." *Id.*

Petitioner also continued to see her PCP for follow-ups. Petitioner had appointments at the Clinton Medical Center on April 23, 2020, May 8, 2020, June 4, 2021, September 26, 2022, February 23, 2023, May 25, 2023, August 28, 2023, December 4, 2023, March 12, 2024, and July 23, 2024. Petitioner reported ongoing weakness in her bilateral lower extremities, balance issues, and used a cane. Petitioner also raised hearing issues, vertigo, acute rib pain, dropping items, foot numbness, migraines, and back pain. Ex. 13 at 13, 19, 33, 38, 41; Ex. 14 at 6, 33, 37; Ex. 15 at 10, 37.

As explained at the June 27, 2025 hearing (and in many prior cases), awarding an amount for pain and suffering is an art and not a science. The parties should look to the general landscape of past pain and suffering awards, and specific past reasoned decisions that they believe to be directly "on point," when presenting their specific valuations of a case that is formally in damages. That information, when offered by the parties, can be highly useful in guiding my award (although a petitioner's personal circumstances are always the foundation of the award ultimately issued).

In her brief, Petitioner argues that her past pain and suffering warrants an award of $195,000.00, based on comparison to the prior reasoned decisions of *Fedewa* and *Johnson*.[4] Pet'r Brief at 21-23; Pet'r Reply Br. at 9. In both of those cases, the petitioner was awarded damages for past pain and suffering in the amount of $180,000. Petitioner argues that her course of treatment and length of ongoing sequelae were more severe than in *Fedewa* and *Johnson*. *Id.*

Respondent seeks a significantly lower award of $110,000. Respondent does not provide any case citations in support of this specific amount, but argues that this case is more akin to *Granville*,[5] in which $92,500.00 was awarded for past pain and suffering. Resp't Br. at 16. According to Respondent, the medical records demonstrate that by April 2020, Petitioner's sequalae had mostly resolved and her EMG/NCS testing showed no

---

[4] *Fedewa v. Sec'y of Health & Hum. Servs.*, No. 17-1808V, 2020 WL 1915138 (Fed. Cl. Spec. Mstr. Mar. 26, 2020) and *Johnson v. Se'cy of Health & Hum. Servs.*, No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018).

[5] *Granville v. Sec'y of Health & Hum. Servs.*, No. 21-2098V, 2023 WL 64413388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023).

further evidence of GBS. *Id.* at 14-16. Respondent also highlights Petitioner's other health conditions as the cause of her ongoing pain and mobility problems. *Id.*

I find *Fedewa* and *Johnson* to be useful comparators for this case. The *Fedewa* petitioner was of a similar age to Petitioner at the time of vaccination. He had a slightly longer inpatient admission (two weeks total of hospital and rehabilitation) but did not need multiple rounds of IVIG. His long-term course involved similar considerations because he suffered limitations to his physical capabilities for a year and a half after vaccination, although he did not need any mobility aids. In total, that individual dealt with residual symptoms of GBS for over two and a half years.

Similarly, the *Johnson* petitioner was in her sixties at the time of vaccination. She was hospitalized for five days and received a single course of IVIG. After three and a half months, she was able to return to her two jobs and no longer needed to use walking sticks. However, she still experienced incontinence, fatigue, and numbness in her legs for over two years after vaccination.

Although neither party discussed my previous decision in *Dillenbeck*, awarding $170,000 in past pain and suffering, I also find it to be comparable.[6] That petitioner was 61 years old and employed at the time of vaccination. She had a five-day hospital stay and a five-day stay in a rehabilitation center. She received two rounds of IVIG and participated in numerous PT sessions. Although the *Dillenbeck* petitioner was able to go back to work (with restrictions) after three months, she continued to suffer from weakness, numbness, and fatigue more than three years after vaccination.

I find that Petitioner's circumstances fit well with these cases. *Fedewa*, *Johnson*, and *Dillenbeck* all involved petitioners in their fifties and sixties who had relatively short inpatient treatment, but dealt with ongoing sequelae that affected their quality of life for two or more years. These cases counsel that Petitioner's award for past pain and suffering should be in the $170,000 to $180,000 range.

However, Petitioner has not provided sufficient justification for an award of $195,000. Although I find her need for multiple rounds of IVIG to be significant, she did not experience a longer or more traumatic course of treatment or a more severe prognosis than in *Fedewa*, *Johnson*, or *Dillenbeck*. Furthermore, unlike the petitioners in those cases, she has not shown disruptions to employment or physically demanding pursuits,

---

[6] *Dillenbeck v. Sec'y of Health & Hum. Servs.*, No. 17-428, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019).

beyond typical activities of daily living and time spent with loved ones. Her spinal comorbidities may also likely explain some of her ongoing symptoms.

At the same time, Respondent's proposal of $110,000 is unacceptably low for this case. *Granville* does not represent a comparable set of facts. That petitioner was 28 years old and in good health at the time of vaccination. Indeed, she acknowledged that she had a mild course of GBS, recovered quickly, and did not suffer from serious complications. She was hospitalized for five days and received one course of IVIG. After she was discharged, she complained of residual symptoms of tingling/numbness for seven months and participated in six sessions of PT. However, she was almost immediately independent and performing full work duties and daily activities without problem by two months post-discharge.

Overall based on my review of this case and comparison to *Fedewa*, *Johnson*, and *Dillenbeck*, I find it appropriate here to award $175,000.00 for past pain and suffering.[7]

## Conclusion

For the foregoing reasons and based on consideration of the entire record, **Petitioner is awarded a lump sum payment of $185,209.45 ($175,000.00 for past pain and suffering and $10,209.45 for unreimbursed expenses) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.** This amount represents compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[8]

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[7] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[8] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.